UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHAMPIONS LEAGUE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY WOODARD, | ) | |
| | ) | Case No.16-2514 |
| and | ) | |
| | ) | |
| GS ADVERTISING CORP. | ) | |
| | ) | |
| | ) | |
| Defendants | ) | JURY TRIAL DEMANDED |

## COMPLAINT FOR FRAUD, CONSPIRACY TO DEFRAUD, BREACH OF FIDUCIARY DUTY, AND VIOLATION OF SEC RULE 10b-5

**COMES NOW**, Champions League, Inc., by and through its attorney of record, Paul Law Group, LLP, to recover damages from GS Advertising Corp., Inc. and Larry Woodard, for fraud, conspiracy to defraud, breach of fiduciary duty, and violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

### CASE SUMMARY

In November 2015, Plaintiff, Champions League, Inc., entered into discussions with Defendants Larry Woodard and GS Advertising Corp., Inc. for an event to be held in St. Louis, Missouri, on April 10, 2016. During these initial discussions, Defendants were provided in good faith by the Plaintiff, much of the Plaintiff's business plans and operations. Plaintiff paid more than $235,000 to Defendants based on Defendant's

1

promises and assurances to provide comprehensive event planning and implementation services for the St. Louis event. The St. Louis event was to be broadcast nationwide by ESPN. With less than two weeks left before the St. Louis event, Plaintiff discovered that Defendants had not performed many of the agreed-upon services. Furthermore, Plaintiff discovered that Defendants' nefarious plan involved not just professional incompetence but also the purposeful sabotage of the St. Louis event in order to take over the business operations of Plaintiff during the fallout following the failed event in St. Louis and benefit from the Plaintiff's established and proprietary trade secrets.

## JURISDICTION

1. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331. This Court also has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

2. Venue is proper in this judicial district because the parties are domiciled in this district and a substantial part of the events giving rise to the claims occurred within this judicial district.

## PARTIES AND BACKGROUND FACTS

3. Champions League, Inc. (hereafter "Champions") is a duly organized New York corporation engaged in launching a new professional basketball league with former and retired professional basketball players.

4. Champions' principal place of business is New York City.

5. GS Advertising Corp., Inc. (hereafter "GS") is a duly organized New York corporation doing business as Graham Stanley Advertising engaged in business as a full-service advertising agency.

6. GS's principal place of business is in White Plains, New York. GS has a business address at 205 Davis Avenue, White Plains, NY 10605.

7. Larry Woodard (hereafter "Woodard") is an individual and the CEO of GS.

8. Upon information and belief, Woodard is the sole owner of GS.

9. Woodard is domiciled in White Plains, New York.

10. Carl George (hereafter "George") is the CEO of Champions.

11. On November 6, 2015, Woodard was introduced to George by a mutual acquaintance.

12. On November 18, 2015 George meet with Woodard regarding Champions and discussed Champions inaugural basketball game to be played in St. Louis on January 29, 2016 at the Chaifetz Arena. George also discussed, at Woodard's request, Champions' business plan, strategies and the substantial work that George had already done in order to form Champions and its various subsidiaries and affiliates.

13. On November 18, 2015 George provided to Woodard and GS, and Woodard and GS signed a Mutual Nondisclosure and Non Circumvention Agreement.

14. On November 19, 2015 Woodard wrote George an email in which he memorialized the meeting the day before, "Our agreement yesterday is that my firm would develop a plan that outlines corporate sales, sponsorship and ticket

sales strategies for $10K.  That we would get 15% of gross revenue for ticket sales."

15. Woodard offered that, "Finally, we [GS] would work in the capacity of AOR for advertising, marketing, and sales for $25k per month, which we would like to be payable on December 1st after we have presented the plan to you, three months up front or $75k."

16. Woodard claimed, "This is squarely within our wheelhouse and we will be able to be an immediate resource for you across the planning for your entire enterprise with our knowledge of the sports industry, our platinum rolodex and feel for your vision."

17. Woodard promised to bring celebrity involvement and notoriety to the inaugural game stating, "Finally, I have reached out to Nelly, his record label and Foundation and will get him and other St. Louis celebs, like Akon to embrace our efforts."

18. Woodard provided his bank information and instructed George to, "Please wire the initial $10K into this account today per our agreement."

19. Enticed by Woodard's promises, Champions wired GS $10,000 that day.

20. On December 1, 2015 Champions received a signed "LETTER OF AGREEMENT" (hereafter "Letter") with GS.

21. The Letter called for GS "to provide sales, marketing and strategic planning services as described in schedule A."

22. Schedule A stated, "The following items will be the responsibility of Graham Stanley with support from Champions League, Inc.," and then listed as "Graham Stanley's Responsibility" the following:

- "Develop and execute scalable ticket selling strategy."
- "Implement for St. Louis event (January 29, 2016) at Chaifetz Arena"
- "Strategy to include advertising, direct sales and social media"
- "Develop plan to solicit corporate sponsorships"
- "Implement sales plan nationally and in team markets"
- "Help develop and implement plan to promote league in all media and digitally."
- "GSA [Graham Stanley Advertising] to take a lead role in helping to devise robust league marketing strategy"
- "Agency to leverage platinum rolodex and core competencies in business to help insure success of the league."

23. Woodard gained George's trust and George quickly relied on Woodard to insure the inaugural St. Louis event succeeded. Champions wired a total of $177,500 to Woodard, as follows:

   23.1 On November 19, 2015 Champions wired $10,000 at Woodard's bequest to GS from Champions' Minnesota bank to GS' New York bank;

   23.2 On December 11, 2015 Champions wired $37,500 at Woodard's insistence to GS from Champions' Minnesota bank to GS' New York bank;

   23.3 On December 21, 2015 Champions wired $40,000 at Woodard's insistence to GS from Champions' Minnesota bank to GS' New York bank;

23.4 On February 10, 2016, 2015 Champions wired $20,000 at Woodard's insistence to GS from Champions' Minnesota bank to GS' New York bank;

23.5 On February 22, 2016 Champions wired $20,000 at Woodard's insistence to GS from Champions' Minnesota bank to GS' New York bank;

23.6 On March 11, 2016 Champions wired $45,000 at Woodard's insistence to GS GS' New York bank.

23.7 Woodard is currently demanding a $45,000 payment for himself and a $35,000 payment for halftime entertainment.

23.8 Each of the aforementioned wire transfers were made at Woodard's insistence relating to a particular aspect needed for the St. Louis event such as advertising, entertainer costs and other expenses purportedly related to the St. Louis event or, upon information and belief, pay Woodard directly.

24. At Woodard's request and urging commencing from the onset on the relationship, George expanded Woodard's personal role in Champions, sharing with Woodard the status of team sales, details of financing the league, corporate strategy for growth, and corporate opportunities.

25. Woodard became a trusted insider with a vast array of knowledge about Champions and its business model. Woodard received copies of Champions' business plans, executive summaries, financial projections and private equity fundraising documents.

26. On January 12, 2016, due to the flooding in the metropolitan St. Louis area, Champions set a new date of April 10, 2016 for the inaugural basketball game.

27. Woodard's extensive knowledge of Champions business plans, his deep involvement in areas beyond advertising and ticket sales, his acceptance of substantial sums of money from Champions, and his signature to the Mutual Nondisclosure and Non Circumvention Agreement made him a fiduciary to Champions.

28. Despite having material nonpublic information relating to Champions and being in a trusted capacity with Champions, Woodard turned his back on Champions and began efforts, nearly from the onset of his engagement, to sabotage the inaugural St. Louis event and take over Champions for himself.

29. On March 11, 2016 in a conversation with Kevin Chen, CEO of Phoenix Financial Services, Champions' investment banker, Woodard openly expressed to Chen that Woodard thought Champions was a great business idea, and that Woodard had spoken with David Stern and according to Woodard, David Stern had predicted that "Champions would not play a single game."

30. Woodard stated affirmatively that Champions would fail to play their inaugural game in St. Louis.

31. Woodard assured Chen to not worry when that happened, because Woodard "would be able to pick up the pieces" with his various contacts and with the support of David Stern and make Champions his success.

32. Based on the foregoing, Woodard knew that "picking up the pieces" of Champions would also include the equity interests Champions was due to receive from its ownership in various league teams.

33. Woodard also knew that Phoenix Financial Services (hereafter "Phoenix"), as the party primarily responsible for securing the initial equity investors in Champions, would have a significant role in the success of Champions going forward.

34. Woodard hoped to secure the support of Phoenix to assume the operations of Champions and control of Champions' assets (which include its equity interests in the league teams) following the failed event of St. Louis.

35. Based on his knowledge of Champions' fundraising efforts with Phoenix and Champions' business plans, Woodard knew that if George had a disastrous event in St. Louis, Champions' investors would likely blame George and cause Phoenix to terminate its relationship with George.

36. Positioned inside Champions and with direct responsibly for major parts of the inaugural event, Woodard was in the position to see that David Stern's prediction that Champions "would never play a game" would become true.

37. Woodard began a scheme to engineer the failure of the inaugural St. Louis event almost immediately upon his engagement by Champions.

38. Upon learning from Chen of Woodard's intention to take over Champions after the inaugural game failed, Champions launched an investigation into Woodard's activities and discovered that Woodard completely failed to initiate and complete any aspect of his engagement, including that fact that Woodward:

- Did not develop and execute a ticket selling strategy.
- Did not effectively advertise and market the event.
- Did not follow up on the church or military market.

- Did not develop nor implement the specific social media relationships promised.

- Did not develop the corporate sponsorships promised.

- Did not buy media spots in the urban market.

- Did not trade or buy media coverage in the American, the African-American newspaper in the St. Louis market.

- Did not secure Nelly's support, but instead inflamed Nelly against the event.

- Did not bring any celebrity involvement or notoriety to the event.

- Did not print nor distribute flyers to the church market.

- Did not print programs.

- Did not secure half-time entertainment until ten days before.

- Did not order uniforms in a timely fashion.

- Did not develop in-arena graphics.

- Did not proof advertising effectively.

- Did not secure "A" level players to participate in the event.

39. Woodard designed and executed a plan to sabotage Champion's inaugural event and usurp Champions and its assets (including equity interests in various basketball league teams) for himself.

40. Woodard and GS utterly failed to perform the services and tasks they were paid for.

41. As a direct and proximate result Champions has been damaged in ticket sales, league reputation, financing, and future opportunity.

## COUNT I:  FRAUD IN PROCURING THE LETTER AGREEMENT AGAINST GS ADVERTISING CORP., INC AND LARRY WOODARD

42. Plaintiff incorporates and alleges paragraphs 1 through 41 as if fully set out in this paragraph.

43. To procure the Letter Agreement, Woodard represented to George that he had expertise, experience, and assured George he had "knowledge of the sports industry, our platinum rolodex and feel for your vision."

44. Woodard enticed George to enter a contract for GS services because the task at hand, making the inaugural St. Louis event a success, was "squarely within our wheelhouse," and that his "platinum rolodex and core competencies in business," would "help insure success of the league."

45. Woodard statements were false.

46. Woodard's statements were material to Champions.

47. Given Woodard's Board of Director positions on the International Speedway Corporation Board and The V Foundation Board, along with the awards Woodard had won in advertising, such as the Gold Effie and The Cannes Gold Lion for the Oprah Car Giveaway, it was reasonable for George and Champions to believe Woodard and GS.

48. George and Champions had no knowledge of the falsity of Woodard's material statements and had no reason to suspect the falsity of Woodard's statement until early March 2016.

49. Woodard intended for George and Champions to act upon the false statements he made to George in the manner reasonably contemplated, by George and Champions hiring Woodard and GS to make the inaugural St. Louis event a success.

50. Both George and Champions were ignorant of the falsity of Woodard's statements at the time Champions hired Woodard and GS.

51. Both George and Champions relied on the truth of Woodard's statements.

52. Given the board of director positions and awards Woodard has, both George and Champions had a right to rely on Woodard's statements.

53. Champions has been, is, and remains injured by the falsity of Woodard's and GS' statements.

**Wherefore,** Plaintiff Champions League, Inc., prays that upon trial and hearing of this matter, the Court finds that Defendants GS Advertising Corp., Inc. and Larry Woodard, committed fraud and declare that the Letter Agreement is void *ab initio* and award to Champions League, Inc. damages, reasonable attorney fees and costs, and such other and further relief in the premises as the Court deems just and proper.

### COUNT II: CONSPIRACY TO DEFRAUD CHAMPIONS AGAINST GS ADVERTISING CORP., INC AND LARRY WOODARD

54. Plaintiff incorporates and alleges paragraphs 1 through 53 as if fully set out in this paragraph.

55. Woodard and GS agreed to sabotage Champions inaugural event in St. Louis.

56. While communicating to Champions that Woodard and GS were diligently working to make Champions inaugural event in St. Louis a success, Woodard and GS took the following acts in furtherance of their agreement to sabotage Champions inaugural event in St. Louis, to wit:

- Promising Champions that they could secure Marcus Camby, Chauncey Billups, Kenyon Martin, Shareef Abdur-Raheem, Kurt Thomas, Rasheed Wallace, Jermaine O'Neal, Jerry Stackhouse, Damon Stoudamire, Steve Nash, Ben Wallace, Antonio McDyess, and Shaquille O'Neal to play in the inaugural game in St. Louis and then never contacting the above players.

- Taking over Champions' social media efforts and then ending the social media campaign.

- Reporting to Champions that McDonalds would be a corporate sponsor, when in fact McDonald's had declined to participate.

- Reporting to Champions that GS "has people on the ground" in St. Louis, when nobody was in St. Louis.

- Reporting to Champions that the advertising is in place in the urban market, when no advertising had taken place in the urban market.

- Reporting to Champions that Under Armour would be providing the uniforms when they were not.

- Reporting to Champions that Nelly is lined up for the half-time show, when he was never contacted.

- Secretly meeting with David Stern and discussing Champions confidential insider information.

- Secretly meeting with Chen in an attempt to line up Chen's support for future financing once Woodard was in charge of Champions and "picking up the pieces."

57. Woodard's and GS' participation in their plan their agreement to sabotage Champions inaugural event in St. Louis was intentional.

58. As a direct and proximate result of Woodard's and GS' conspiracy Champions has been and will be damaged into the future.

**Wherefore,** Plaintiff Champions League, Inc., prays that upon trial and hearing of this matter, the Court finds that Defendants Larry Woodard and GS Advertising Corp. conspired to defraud Champions League, Inc., and award to Champions League, Inc. damages, reasonable attorney fees and costs, and such other and further relief in the premises as the Court deems just and proper.

## COUNT III:  BREACH OF FIDUCIARY DUTY AGAINST LARRY WOODARD

59. Plaintiff incorporates and alleges paragraphs 1 through 58 as if fully set out in this paragraph.

60. Woodard became a trusted advisor and consultant to Champions.

61. Woodard accepted Champions' money and pledged his loyalty to the team.

62. Woodard, by virtue of his intimate relationship with Champions, had a fiduciary duty to act in Champions' best interest at all times.

63. Woodard had a duty to help Champions succeed in its inaugural game in St. Louis.

64. Woodard breached that duty by

    - Working against the success of the inaugural St. Louis event.

    - Deceiving George and Champions into believing that he was working for the success of the inaugural event and Champions' league, when in fact Woodard was not.

    - Meeting with David Stern and "bad mouthing" Champions ability to succeed.

    - Meeting with Champions investment banker, Kevin Chen, and "bad mouthing" Champions' ability to succeed.

    - Planning to sabotage the inaugural St. Louis event so that Woodard could step in "and pick up the pieces" for himself.

65. As a direct and proximate result of Woodard's breaches of his fiduciary duties Champions has been and will be damaged into the future.

**COUNT IV: VIOLATION OF SECTION 10B OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 THEREUNDER AGAINST GS ADVERTISING CORP. AND LARRY WOODYARD**

66. Plaintiff incorporates and alleges Paragraphs 1 through 64 as if fully set forth in this paragraph.

67. SEC Rule 10b-5 makes it unlawful for any person to make any untrue fact or to omit to state a material fact or to engage in any practice or course of conduct

which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

68. Plaintiff brings this Count IV as an investor in the league teams contemplated by the Plaintiff's business plan.

69. In a typical §10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U. S. 336 (2005).

70. As stated above, Defendants' role within Champions League, Inc. expanded well beyond a contractual consultant relationship.

71. Defendants materially misrepresented the status of the St. Louis Event and his ongoing work for the Plaintiff.

72. Defendants made material misrepresentations regarding his contact with major sponsors such as McDonalds, former professional athletes, and major celebrities who may be involved in the event, such as Nelly and Akon.

73. Defendant Woodard's conversation with Kevin Chen revealed that Woodard never intended to have the St. Louis event succeed. On the contrary, Woodard actually revealed that his intention was for the event to fail so that he could come in and "pick up the pieces" to the detriment of the Plaintiff and the current investors.

74. Woodard and GS did not accomplish any single material item as part of his/its responsibilities that were necessary to create the St. Louis event. Matters as

simple as ordering basketballs and uniforms for the players were not done. All the while, Woodard and GS made affirmative statements to Champions that the St. Louis event was on track and would be a success when all along Woodard and GS knew that (1) the St. Louis event was not going to be successful and that (2) the failure of the St. Louis event, had it gone ahead on April 10, 2016 as originally planned, would have provide disastrous to George and the Company.

75. Certain investors were drawn into Champions League, Inc. and the league teams because of the Defendant's fraudulent representations. Woodard was present during several investor presentations conducted by Champions and Woodard had copies of material business plans and other strategic materials which were all developed at considerable expense by Champions and George.

76. Champions League, Inc. invested into the league teams and structured the company so that the Plaintiff would be an investor in each of the separate entities because of Defendant's anticipated success with the St. Louis Event (which were based in a large part on Woodard's continued insistence that the event planning was going well and that St. Louis would be a big success).

77. As a result of Defendants' misrepresentation, Plaintiff suffered economic loss in the form of decreased value of the membership interest in the league teams, and other actual business losses totaling not less than $1,177,500.

78. Based on Defendants' intimate knowledge of Plaintiff's business and financials, Defendant knew that failure to complete any of the contemplated work on the St. Louis event would lead directly to Plaintiff's economic loss.

79. Defendant's misrepresentations of the work done in furtherance of the St. Louis event and the overall status of the event directly led to Plaintiff's economic loss.

**Wherefore,** Plaintiff Champions League, Inc., prays that upon trial and hearing of this matter, the Court finds that Defendants Larry Woodard and GS committed material misrepresentations in violation of SEC Rule 10b-5 against Champions League, Inc. and award to Champions League, Inc. damages, reasonable attorney fees and costs, and such other and further relief in the premises as the Court deems just and proper.

PAUL LAW GROUP, LLP
Attorney for Plaintiff
902 Broadway Fl. 6
New York, NY 10010
Tel: (646) 202-2532

Dated:      April 5, 2016                By: _/s/ Wesley J. Paul_

                                              Wesley J. Paul

_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

CHAMPIONS LEAGUE, INC.,

*Plaintiff*,

-against-

LARRY WOODARD
GS ADVERTISING CORP.

*Defendants*

_____

COMPLAINT
_____

PAUL LAW GROUP, LLP
Wesley J. Paul, Esq.
Attorney for Plaintiff
902 Broadway Fl. 6
New York, NY 10010
(646) 202-2532